**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| Robert E. Taglialatela, Jr. | ) | |
| Plaintiff, | ) | C.A. No. 5841-MA |
| | ) | |
| v. | ) | |
| | ) | |
| Phyllis T. Galvin, Trustee Irrevocable | ) | |
| Trust of Robert E. Taglialatela, Sr. | ) | |
| Defendant | ) | |

**MASTER'S REPORT**

Date Submitted:  October 27, 2014
Draft Report:  August 14, 2014
Final Report:  February 23, 2015

Pending before me are exceptions to the Accounting of the Robert E. Taglialatela Irrevocable Trust (the "Trust") filed by its former trustee, Phyllis Galvin-Moore.  The Trust was created by Robert E. Taglialatela, Sr. in 1998 for the benefit of his six children:  Beatrice Juliano, Robert E. Taglialatela, Jr., Phyllis Galvin-Moore, Diane Green, Francine Schmitt, and Elizabeth ("Beth") Gorman. Robert, Beatrice, and Beth are the three beneficiaries who have taken exceptions to the accounting.[1]

Factual Background

---

[1] I will refer to the six beneficiaries by their first names to avoid confusion, and mean no disrespect by this practice.

The Trust originally held one asset, real property located at 100 High Street, Oxford, Maryland (the "Oxford Property"), that had been purchased in 1976 as a future retirement home for Mr. and Mrs. Taglialatela, Sr., who resided in Lansdale, Pennsylvania.[2] In 1988, Beatrice moved into the Oxford Property with her family after her husband lost his job, and Beatrice remained there with her two children for 22 years without paying rent; her parents paid the expenses related to the property.[3] In 1998, Mrs. Taglialatela suffered a stroke and the couple became concerned about their future health care costs.[4] A trust agreement was drafted by a Delaware lawyer who, at the time, was in a relationship with their daughter Phyllis,[5] and the couple transferred the Oxford Property into the Trust. Mrs. Taglialatela passed away in 2002, and as Mr. Taglialatela, Sr. began to suffer his own health problems, tensions developed among his children in part due to Phyllis's unilateral actions.

In 2008, Phyllis, in her capacity as Trustee, conveyed the Oxford Property back into her father's name because she doubted that the Trust was still in existence.[6] Approximately six months later, Phyllis, in her capacity as power of

---

[2] Trial Transcript ("TT") 1/1/13 at 65.
[3] *Id.* at 20-22, 54-56, 99, 102
[4] *Id.* at 40
[5] *Id.* at 30-32, 51
[6] *Id.* at 29-31.

attorney for Mr. Taglialatela, Sr., conveyed the Oxford Property to herself in her capacity as Trustee, after she obtained a copy of the trust agreement.[7]

In 2009, Phyllis sought to have her father, who was suffering from dementia, declared incompetent by a Pennsylvania court.[8] After a hearing in November 2009, the court appointed a neutral professional guardian, Supportive Care Services, as guardian of Mr. Taglialatela, Sr., who was then removed from his home and placed in an assisted living facility in Pennsylvania.[9] Around this same time, Phyllis sued Beth in Maryland for non-payment of a loan Phyllis had made to Beth in 1993.[10] They eventually settled the dispute for $3,000.00, but Beth had no money so Phyllis put a lien on Beth's share of the Trust.[11]

In November 2009, Francine drove her father to Oxford to spend Thanksgiving with Beth's family.[12] Phyllis called several police agencies in Maryland and Pennsylvania, and the Maryland Department of Social Services to report a kidnapping and possible neglect case.[13] In early December 2009, Phyllis sent Beatrice an eviction notice.[14] Shortly thereafter, Phyllis sent Beatrice a

---

[7] *Id.* at 36, 40.
[8] *Id.* at 115.
[9] *Id.* at 115, 118.
[10] *Id.* at 93-97.
[11] *Id.*
[12] *Id.* at 74-75.
[13] *Id.*; TT 12/5/13 at 33.
[14] TT 1/10/13 at 115-116.

proposed rental agreement for the Oxford Property for $1000.00 per month.[15] Beatrice refused to pay rent, but voluntarily vacated the Oxford Property on June 19, 2010.[16]

On June 24, 2010, Francine took her father to a hospital emergency room; he was diagnosed a week later with advanced cancer.[17] When Beatrice's two daughters tried to visit their grandfather in the hospital, they and other family members were ordered to leave by hospital staff at Phyllis's direction.[18] Mr. Taglialatela, Sr. died in July 2010. According to the terms of the Trust, upon the death of Mr. Taglialatela, Sr., the undistributed net income and principal were to be distributed to his six children.[19]

Phyllis, who was named as executrix in her father's will, hired a Pennsylvania estate attorney,[20] but another Pennsylvania attorney, Stacy Greenberg, was appointed as administrator of Mr. Taglialatela, Sr.'s estate.[21] The estate was insolvent so Mr. Taglialatela, Sr.'s home and tangible personal property in Pennsylvania were sold at auction to pay creditors, with family members having

---

[15] *Id.* at 117.
[16] *Id.* at 125.
[17] *Id.* at 122.
[18] *Id.* at 73-74, 123-24.
[19] *Id.* at 137.
[20] TT 5/22/14 at 14.
[21] TT 1/10/13 at 59.

to bid on any sentimental items they wished to retain.[22]  Phyllis was one of the creditors since she had paid the costs associated with Mr. Taglialatela, Sr.'s assisted living facility.[23]

The same Maryland law firm that assisted Phyllis in her suit against Beth had been providing Phyllis with trust-related advice since October 23, 2009.[24] After Beatrice vacated the Oxford Property, Phyllis, in her capacity as Trustee, sold the Oxford Property for $187,000.00 on November 17, 2010, and the net sale proceeds of $158, 895.85 were placed in the Trust.[25]

Shortly before the sale of the Oxford Property, Robert had filed a *pro se* petition in this Court on September 22, 2010, seeking to remove Phyllis as trustee for threat of self-dealing and breach of fiduciary duty.[26]  Robert unsuccessfully attempted to serve Phyllis with a summons and a copy of the petition at her home on multiple occasions, and at her workplace in Wilmington, Delaware.[27] Nevertheless, Phyllis was aware of her brother's petition.  On September 27, 2010, Phyllis's Maryland attorney reviewed Robert's petition,[28] and on November 23, 2010, Phyllis consulted with a Delaware attorney at Woloshin, Lynch, Natalie and

---

[22] *Id.* at 90-91.
[23] *Id.* at 91-92.
[24] Affidavit of Demetrios G. Kaouris, Esquire, Ex. 8 of the Trust Accounting.
[25] HUD Settlement Sheet, Ex. 1 of the Trust Accounting.
[26] Docket Item ("DI") 1.
[27] DI 6 & 7.
[28] Accounting of time and Expenses at 3, Ex. 8 of the Trust Accounting.

Gagne, P.C. (the "Woloshin firm"), about Robert's trust petition.[29]  In a letter to the beneficiaries dated November 24, 2010,[30] Phyllis's Maryland attorney informed them that Phyllis had deducted a total of $18,933.55 for legal fees, expenses associated with the Oxford Property, and a trustee commission in the amount of $8,120.28.  He further wrote:

> "Because of the threatened and pending litigation by Robert Taglialatela, Jr. ("Mr. Taglialatela), the Trustee must hire attorneys in order to defend her actions.  As a consequence, the Trustee, in her discretion, has decided to retain Miles & Stockbridge, P.C. as well as Woloshin, Lynch, Natalie and Gagne, P.C. in connection with this pending and threatened litigation.  She will be paying to Miles & Stockbridge, P.C. and Woloshin retainers in the amount of $5,000 and $10,000, respectively.  Again, the purpose of these retainers is to defend against the pending and threatened litigation initiated by Mr. Taglialatela.  If the litigation is resolved without the expenditure of these fees, then, of course, they will be refunded to the Trustee, added to the corpus and disbursed in accordance with each beneficiary's interest.
>
> Please be advised that the Trustee is authorized to spend Trust corpus on legal fees associated with administration of the Trust and defend her actions as Trustee.  *See e.g. In re Nancy Couch Trust*, Del. Ch., 723 A.2d 376 (1998); Restatement (Third) Trusts § 88 (2007).  We hope that the litigation can be resolved without the expenditure of significant Trust assets to the detriment of the Trustee and the beneficiaries of the Trust.
>
> Given the pending litigation, Ms. Galvin does not intend to distribute the corpus of the Trust at this time.  We believe that

---

[29] Detail Fee Transaction File List at 1, Ex. 6 of the Trust Accounting.

[30] Respondent's Trial Ex. 3.  Only four of the five other beneficiaries were sent copies of this letter.  It appears that Francine's omission was inadvertent since she was copied on all subsequent letters from Phyllis's attorneys.  *See* Respondent's Trial Exs. 4-10.

distributions may be made more promptly if all of the Trust beneficiaries execute an agreement that releases the Trustee from any and all liability associated with the administration of the Trust. We believe that the execution of an appropriate release, followed by disbursement, without the expenditure of significant legal fees, will allow each of you to realize the benefit of the Trust. Please let me know your willingness to execute a release associated with the Trustee's conduct in connection with the administration of the above-captioned Trust."[31]

A second letter from the Maryland attorney, dated December 23, 2010, was sent to the beneficiaries, encouraging them to sign a proposed settlement agreement that was enclosed with the letter, and warning them that if the agreement was not signed by all of the beneficiaries, the trustee would be forced to defend the pending litigation in Delaware.[32] Meanwhile, in December 2010, an attorney in the Woloshin firm filed on Phyllis's behalf a petition for a protection from abuse order against Robert in the Family Court in New Castle County because Robert had been sending emails to Phyllis's employer accusing her of money laundering.[33] Phyllis was awarded an Order for Protection for Abuse on January 14, 2011.[34]

A third letter from the Maryland attorney, dated January 5, 2011, was sent to the beneficiaries stating:

---

[31] Respondent's Trial Ex. 3 at 2.
[32] Respondent's Trial Ex. 4.
[33] Affidavit of William L. O'Day, Jr., Esq., Ex. 7 of Trust Accounting
[34] *Id.* at Ex. E.

"Although we have not received responses from all of you regarding the proposed settlement agreement and release ("Settlement Agreement"), at least two of you have responded and indicated an unwillingness to enter into the Settlement Agreement. For that reason, Phyllis Galvin ("Ms. Galvin") will be accepting service of the Complaint in the Delaware litigation and will defend the action that has been filed by Robert E. Taglialatela, Jr. You should be advised that no disbursements from the Trust shall be made while the issues are being litigated in the Delaware court."[35]

Coincidentally, on January 5, 2011, Robert filed a motion for default judgment in this action.[36] On January 6, 2011, Phyllis's Delaware trust litigation attorney entered her appearance in this Court for the limited purpose of opposing the motion.[37] When Phyllis finally filed an answer to Robert's trust petition nearly a year later, on December 22, 2011,[38] she counterclaimed that Robert's harassing emails, his frivolous appeals from the Protection from Abuse Order, and his other frivolous lawsuits – Robert's petition for an estate accounting filed in Pennsylvania on January 2011, Robert's petition for a protection from abuse order against Phyllis filed in Pennsylvania on February 9, 2011, and Robert's tort action against Phyllis filed in Maryland on February 16, 2011 - had resulted in the dissipation of Trust assets. Shortly before trial took place, however, Phyllis voluntarily withdrew her counterclaim.[39]

---

[35] Respondent's Trial Ex. 5.
[36] DI 8.
[37] DI 9.
[38] DI 40.
[39] DI 69.

A one-day trial in this action took place on January 10, 2013. Phyllis, Beatrice, Beth, and Robert were the only witnesses. I reserved decision for 30 days in order to give the parties time to settle their dispute and distribute the Trust assets to the beneficiaries. When no agreement was forthcoming, I issued a draft report on February 11, 2013, recommending that the Court: (1) remove Phyllis as trustee because of the intractable hostility between her and the other beneficiaries; and (2) order an accounting of Phyllis's administration of the Trust from the date of the sale of the Oxford property through the date of the issuance of the Final Order. Phyllis took exception to my draft report, but later withdrew her exception on April 17, 2013.[40] The draft report was approved as a Final Order of the Court on May 16, 2013.[41] After the successor trustee named in the trust document declined to serve, I appointed Daniel T. Crossland, Esq. as Successor Trustee of the Trust on October 11, 2013.[42]

The Trust Accounting

On August 8, 2013, Phyllis filed an accounting of the Trust covering the period from November 17, 2010 to May 16, 2013.[43] The accounting showed that

---

[40] DI 92.
[41] DI 96.
[42] DI 117.
[43] DI 103.

the starting principal following the sale of the Oxford Property was $158,895.85.[44]

The remaining principal at the end of the accounting period was $74,901.45. The

deductions totaled $89,598.63, most of which reflected attorney fees and costs –

approximately $70,000.00 in total fees and costs. The remaining deductions were

for trustee's commission, fiduciary taxes, accounting fees, homeowners insurance,

and miscellaneous small expenses. Beatrice and Beth took exceptions to Phyllis's

accounting, claiming that the accounting documentation was incomplete and that

Phyllis had improperly used trust funds for her litigation against the beneficiaries.

Robert took 12 separate exceptions to the accounting, which can be grouped into

four categories: (1) failure to provide complete supporting documentation; (2)

failure to account for $10,000.00; (3) use of trust assets to pay Phyllis's personal

legal expenses; and (4) use of trust assets to reimburse Phyllis's expenses and to

pay her trustee commission. A hearing on the exceptions took place over two days

on December 5, 2013, and May 22, 2014. I reserved decision in order to go

through the attorney fees with a fine tooth comb.

After the accounting was filed, it was audited by Court staff who observed

some deficiencies in the supporting documentation and some discrepancies

---

[44] Although Robert complained that the price was too low and the former trustee should have waited until the housing market improved before selling the Oxford Property, there was no evidence that the sale price did not reflect the fair market value of this asset. Additions to this initial principal amount, consisting of interest

between the amounts listed on the schedules and the exhibits attached to the accounting. At the Court's request, Phyllis supplied copies of cancelled checks from two bank accounts and provided explanations for the various discrepancies that had been observed. An amended accounting was filed. Having reviewed the additional materials, I am now satisfied that sufficient documentation was provided to audit the accounting and that all of the funds in the Trust have been accounted for.[45] Therefore, I am dismissing these two exceptions. There remains the issue of the appropriateness of the deductions during the accounting period.

Beth claims that Phyllis used trust funds to file a personal suit against her for non-payment of the 1993 loan. I have carefully reviewed the affidavit of fees and accounting of time and expenses of Demetrios G. Kaouris, Esq., of Miles & Stockbridge, P.A., the Maryland firm retained by the former trustee. From 2009 to 2012, this firm invoiced $22,126.10 in attorney's fees and $353.95 in costs to the Trust. These fees and costs pertain to trust matters with a few exceptions. The following fee entries pertain to non-trust matters: (1) Mr. Taglialatela, Sr. ("communicate w/ Phyllis re: Father's removal to Oxford" on 11/30/2009 for $170.00); (2) the guardianship ("review emails re: guardianship" on 12/04/2009

---

earned on the funds and a Maryland tax refund, increased the total trust assets to $168,072.96.

[45] According to the supplemental submission of Phyllis's attorney dated September 17, 2013, the difference between the Accounting Deduction and the Affidavit of

and 12/08/2009 for $32.50 each, "conference with DGK; trust, guardianship issues" on 1/25/2010 for $105.00, and "multiple emails re: Oxford, the guardianship and the estate" on 7/11/ 2010 for $175.00); and (3) Beth's judgment ("confer w/ B. Gorman re: judgment" on 11/23/2010 for $33.50). In addition, there are two entries, the first on June 1, 2011 ($34.50) and the second on October 31, 2011 ($69.00), reflecting communications on the garnishment of trust proceeds. I do not need to determine whether the former trustee is entitled to garnish Beth's share of the trust proceeds to obtain the amount that Beth agreed to pay Phyllis in settlement of Phyllis's personal debt action against her. However, Phyllis's use of trust funds to pay for legal advice to garnish a portion of a beneficiary's share of those funds for a personal debt amounts to self-dealing and, therefore, was a breach of her duty of loyalty as trustee. Therefore, I recommend that the Court disallow the above expenses[46] and surcharge the former trustee the amount of $448.03 in fees that were improperly paid to Miles & Stockbridge.

Robert also claims that trust funds were used improperly by the former trustee to pursue personal litigation against him. Phyllis testified that everything

Attorney's fees for Woloshin, Lynch, Natalie & Gagne, P.A., $1,946.85, was the balance of a retainer that remained in Woloshin's escrow account. DI 115.
[46] To the extent that certain fee entries covered both trust and non-trust matters, I reduced the fee amount by the applicable fraction, i.e., if there were two matters in one entry, the fee was divided in half. So for the entry on 1/25/2010, the proper fee should have been $52.50 and for the entry on 7/11/10, the proper fee should have been $116.66.

she did was on the advice of counsel. Nevertheless, her own testimony indicates that her Family Court litigation was not initiated to benefit the Trust or to defend her administration of the Trust, but rather to protect herself and her employment against what she characterized as harassment by Robert, i.e., Robert's emails to Phyllis's employer, Bank of America, accusing Phyllis of laundering money.[47] The Family Court Commissioner's Order dated May 15, 2011, which denied Robert's Motion to Vacate the Protection from Abuse ("PFA") Order dated January 14, 2011, stated that the original abuse finding "was based on an incident that happened in a court proceeding in Pennsylvania and the repeated emails that were threatening Ms. Galvin-Moore's job."[48] Thus, the PFA litigation undertaken by Phyllis on the advice of counsel pertained to her position as a Bank of America employee, not her position as a trustee of this Trust. William L. O'Day, Esq. of the Woloshin firm represented Phyllis in connection with the PFA matter in the Family Court of Delaware (Case No. 10-41953). The Trust was invoiced fees and costs totaling $18,914.98 for this representation. The Family Court also ordered Robert to pay attorney's fees in the amount of $4,829.00, and the order was reduced to a judgment that was filed in Superior Court, which O'Day has stated in his affidavit will be paid back to the Trust when collected. I recommend that the Court disallow the entire amount of O'Day's fees and costs and surcharge the former

---

[47] TT 5/22/14 at 10-13.

trustee the amount of $18,914.98 that was paid to the Woloshin firm for its representation of the former trustee in Family Court since it was undertaken to benefit Phyllis personally, and not in her capacity as trustee of the Trust. Similarly, I recommend disallowing the transcript cost of the Family Court proceedings on April 27, 2011,[49] which should not have been charged as an expense of the Trust, and surcharging Phyllis an additional $114.75 for the transcript.

Trust assets in the amount of $3500.00 were paid to Charles Peruto, Jr., Esq., as his fee for defending Phyllis when Robert filed a PFA petition against her in the Court of Common Pleas of Montgomery County, Pennsylvania in February 2011, according to Peruto's affidavit attached to the Trust accounting.[50] According to this affidavit, after Robert voluntarily dismissed his petition the day after he filed it, the Court awarded attorney fees in the amount of $3,500.00 plus costs for a total of $3,602.00.[51] However, the record also contains Pennsylvania court orders showing that on May 12, 2011, the court awarded Phyllis a judgment of $3,500.00 plus $102.00 in costs after Phyllis filed a complaint against Robert for abuse of process and malicious prosecution on April 1, 2011.[52] Not only is there no

---

[48] Affidavit of William L. O'Day, Ex. F.
[49] Ex. 15 of the Trust Accounting.
[50] Ex. 9 of the Trust Accounting.
[51] *Id.*
[52] Exhibit H to Phyllis's Verified Answer and Counterclaim. DI 40.

evidence that Robert's PFA petition was directed at Phyllis in her capacity as trustee, there is also no evidence that Phyllis's complaint against Robert for abuse of process and malicious prosecution was brought on behalf of the Trust. Therefore, I recommend that these expenditures be disallowed and the Court surcharge Phyllis for $3500.00 in attorney's fees and $102.00 in costs that were paid by the Trust.

A review of the affidavit of fees and bills submitted by Thomas A. Boulden, Esq. of Timoney Knox, LLP, reveals that the Trust was properly invoiced a total of $1,575.00 from March 2012 until May 2012, for work performed for the Trust. This work arose because of Robert's involvement in litigation surrounding the Estate of Robert E. Taglialatela, Sr. in Pennsylvania. Specifically, Robert had taken the position that the Trust was void because Phyllis had transferred the Oxford Property out of the Trust and into the name of her father in 2008. Boulden addressed this issue in the Orphans' Court, and apparently was successful in keeping the Trust separate from the estate.[53] Boulden also spent time reviewing the numerous emails that Robert sent to numerous attorneys, including Boulden, regarding the trust litigation in Delaware.

A review of the Affidavit in Support of Attorney's Fees and Detail Fee Transaction File List submitted by Natalie Woloshin, Esq., reveals a few entries

that should not have been charged to the Trust. On January 18, 2011, Woloshin made a telephone call to a probation officer in Maryland.[54] On April 25, 2011, Woloshin reviewed bankruptcy documents, and emailed her client and the Family Court. On April 27, 2011, and again on September 21, 2011, Woloshin held a conference with O'Day. On October 12, 2011, Woloshin reviewed emails from Family Court, and on December 12, 2011, she sent to and reviewed an email from her client regarding the garnishment of Robert's share of the Trust. I have already determined that the Family Court proceeding was not initiated for the benefit of the Trust, and that the former trustee should not have used trust funds to obtain legal advice on how to garnish another beneficiary's share of the Trust. There does not appear to have been any benefit to the Trust in having this attorney review what were, presumably, documents relating to Robert's personal bankruptcy or call Beth's probation officer in Maryland. Therefore, the Court should disallow the fees relating to these specific transactions and surcharge Phyllis the amount of $355.00 for improper fees paid to the Woloshin firm.

Phyllis received trustee commissions in the total amount of $9,217.43. The accounting contains an email from Woloshin to Phyllis dated November 26, 2010, indicating that, based upon the sales price of the Oxford Property, Phyllis was

---

[53] In this Court, Robert also expressed his opinion that the Trust was not a valid trust after the conveyance in 2008. TT 1/10/2013 at 120.

entitled to a principal commission of $676.69.  Since Phyllis had been a trustee for 12 years and had performed services for her father and the Oxford Property during that time, Woloshin multiplied this number by 12 and calculated a total commission of $8,120.20 from 1998 through 2010.  Phyllis's subsequent income and principal commissions for 2011 were calculated at $23.64 and $535.62, respectively, and for 2012, $9.46 and $528.43, respectively,[55] for a total of $9,217.43 in commissions received.

Under Court of Chancery Rule 132, a trustee is entitled to a fiduciary commission for the care and management of property.  The commission can be for a period covering one month, three months, six months or a year.  If a principal commission is taken on an annual basis, it must be computed on the basis of the fair value of the trust estate "determined as part of a periodic review of trusts by the trustee, such review to be of a date not more than 12 months prior to the date of making such annual charge."[56]  There is no evidence of any periodic review of the Trust during the period 1998 to 2010.  The only evidence of fair value is the November 17, 2010 sales price of the Oxford Property.  Since there is no evidence that the trustee or her attorneys knew the fair value of the trust estate in 1998 and each year thereafter until 2010, it was a breach of the trustee's duty of care and

---

[54] Beth testified that her probation officer had been informed by Phyllis that Beth had drugs in her home, resulting in a raid on Beth's home.  TT 12/05/2013 at 32.
[55] Respondent's Trial Exs. 11-12.

loyalty simply to multiply the 2010 principal commission by 12. The Court should, therefore, disallow all but $1,773.84, which represents the principal commission for 2010, and the principal and income commissions for 2011 and 2012, and surcharge Phyllis for the balance, i.e., $7,443.49.

I recommend, therefore, that the Court disallow a total of $30,878.25 in attorney fees and costs associated with litigation that was initiated or defended by the former trustee for her personal benefit, to the detriment of the Trust, and surcharge the former trustee this amount. This amount, however, is less than half of the legal fees incurred by the Trust after the former trustee launched a large-scale defense against Robert's efforts to remove her for breach of fiduciary duty and threatened self-dealing. Ironically, as it turns out, there is no evidence that Phyllis breached her fiduciary duty prior to the initiation of this action. However, Phyllis's avoidance of legal process while she tried to convince her siblings to sign releases and Phyllis's filing of a counterclaim against Robert only appeared to exacerbate the conflict between the parties.

The unfortunate fact of this case is that several of Phyllis's siblings mistrusted Phyllis, and suspected the worst of her. The guardianship and estate litigation in Pennsylvania, mentioned by witnesses many times during this action, formed the backdrop for Robert's trust petition, which, in turn, appeared to spawn

---

[56] Rule 132(b).

PFA actions in Delaware and Pennsylvania. While at one level, these proceedings all pertained to members of the same family, at another level the proceedings involved different legal constructs, i.e., a guardianship, a decedent's estate, an irrevocable trust, and individuals involved in domestic disputes. Some of the legal nuances appear to have eluded and frustrated Robert, who represented himself throughout these proceedings. In an effort to obtain information about the different proceedings, Robert repeatedly sent emails to four or more attorneys at any given time, thereby increasing the costs to the Trust. Robert's actions, in this respect, harmed not only the Trust, but all of it beneficiaries, including himself.

Conclusion

For the reasons stated above, I recommend that the Court sustain the exceptions to the former trustee's accounting insofar as certain legal fees and costs paid by the Trust did not benefit the Trust, and surcharge the former trustee in the amount of $30,787.25, representing the total of fees and costs paid by the Trust because of the former trustee's breach of fiduciary duty. The remaining exceptions should be dismissed.

Exceptions to Draft Report

In my draft report, I recommended that the Court dismiss the exceptions filed by Robert, Beth and Beatrice to the final trust accounting filed by Phyllis, the former trustee, except for certain legal fees and costs totaling $30,787.25 that were

paid out of Trust funds as a result of self-dealing on the part of the former trustee. As a result, I recommended that the Court surcharge Phyllis in the amount of $30,787.25 for her breach of fiduciary duty. Robert and Beatrice have now filed numerous exceptions to my draft report. I have reviewed their exceptions, the legal memoranda in support of and in opposition to the exceptions, and now recommend that all of Beatrice's exceptions be dismissed and that Robert's exceptions be dismissed in part and upheld in part for the following reasons.

Beatrice's exceptions include her concerns about the value of the Trust asset, i.e., the Oxford house, that was sold and the manner in which it was sold. In addition, Beatrice complains about the number of attorneys that were hired by Phyllis when she was trustee. The bulk of her exceptions, however, pertain to events that allegedly took place before Mr. Taglialatela, Sr. passed away in Pennsylvania, none of which are relevant to the trust accounting and, therefore, should be dismissed. Regarding her other exceptions, the record shows that the hearing on the parties' exceptions to the trust accounting took place over two days. During the course of the first day, December 5, 2013, only the three exceptants had an opportunity to testify, and no one testified about the method of sale or the value of the Oxford house in 2010. At the conclusion of the first day, I gave the parties several weeks to see if they could reach a settlement before rescheduling the hearing. Settlement efforts were to no avail, and the hearing was rescheduled for

May 22, 2014. On May 22, 2014, Beatrice failed to appear and thus waived her opportunity to question the former trustee regarding the method of sale of the Oxford house and its value. I recommend, therefore, that Beatrice's exceptions to my draft report be dismissed as waived or irrelevant.

Robert's exceptions are numerous. In his first exception, Robert contends that none of the former trustee's expenses related to the defense of this action should be borne by the Trust because Phyllis should have known when she transferred the deed to the Oxford house back into their father's name that the Oxford house was an asset of the Trust. Second, Robert complains that the former trustee has not been sanctioned in any way for her behavior, and that all legal fees related to the counterclaim she filed against him should be returned to the Trust because the former trustee used the counterclaim to harass him. Third, Robert takes exception to the use of the term "money laundering" in my draft report, and also contends that legal fees used to block discovery of Bank of America accounts should be reimbursed to the Trust, in addition to requesting that the Court order Bank of America to provide those account records to Robert. Fourth, Robert takes exception to the cost of the former trustee filing and then withdrawing her exceptions to my draft report dated February 11, 2013, in which I recommended that she be removed as trustee. Robert's fifth exception is slightly rambling. He appears to take exception to the draft report's conclusion that his trust petition

appeared to have spawned PFA actions in Delaware and Pennsylvania. Robert contends that it was the action of Miles and Stockbridge and the former trustee, who reneged on an agreement to provide Robert with the escrow account number and banking information related to the sale of the Oxford house, which spawned this litigation. According to Robert, he would have blocked the sale of the Oxford house had it not been for this agreement, which in turn would have prevented the current litigation. As a result, Robert wants all of the legal fees and costs that were paid to Stockbridge and Miles, other than settlement expenses, returned to the Trust. Robert also contends that the former trustee was not avoiding service of process merely because she was waiting for the other beneficiaries to accept the proposed settlement agreement; she already knew that the majority of the beneficiaries would not sign the agreement. Therefore, in his sixth exception, Robert contends that all fees and costs paid to Woloshin, Lynch, Natalie & Gagne from October 20, 2011 onward should be returned to the Trust because the law firm assisted the former trustee in avoiding service of process. Seventh, Robert takes exception to the draft report's description of his own actions as harmful to the Trust and its beneficiaries, and the draft report's conclusion that the former trustee had not breached her fiduciary duty prior to the initiation of this action. According to Robert, the former trustee had breached Court of Chancery Rule 132 multiple times concerning her trustee commissions from 1998 to 2010.

I reject Robert's first exception claiming that none of the former trustee's legal expenses in defending against Robert's petition to remove her as trustee would have been incurred had Phyllis exercised reasonable due diligence before she attempted to transfer the Oxford house out of the Trust and back into Mr. Taglialatela, Sr.'s name in late 2007 or early 2008. This was an irrevocable trust; the property could not be transferred out of the Trust without risking a determination that this was a sham trust, with the resulting loss of the property to the creditors of the Estate of Robert E. Taglialatela, Sr. Even if this purported transfer had been a breach of trust by Phyllis, it had no ultimate legal consequence to the Trust or its beneficiaries since Phyllis executed another deed transferring the property back into the Trust. The Oxford house remained an asset of the Trust until it was sold in November 2010, whereupon the net sales proceeds continued to be held in trust for the beneficiaries.

I reject Robert's second exception, in part, as to his claim that the former trustee has not been sanctioned for her behavior. My recommendation that Phyllis be surcharged over $30,000.00 is a form of sanction. However, I uphold Robert's second exception in part as to his claim that the former trustee's legal expenses related to the counterclaim that she filed in this action should be returned to the Trust. The basis for the counterclaim, which the former trustee later withdrew, was that Robert's frivolous lawsuits against Phyllis in Pennsylvania, Delaware, and

Maryland had dissipated Trust proceeds to the detriment of its beneficiaries. In my draft report, I disallowed the legal fees directly associated with these lawsuits after finding that the lawsuits had not been initiated to benefit the Trust or to defend the former trustee's administration of the Trust, but rather to protect Phyllis herself and her employment against harassment by Robert. Accordingly, I am recommending an additional $1110.00 of Woloshin's fees[57] related to the counterclaim be disallowed and that the former trustee be surcharged this additional amount.

I reject Robert's third exception in part because the phrase "money-laundering" was used by the former trustee during her direct examination to describe the accusations made by Robert in e-mails sent to her employer, the Bank of America.[58] Although Robert objected at trial to the former trustee's use of that term, claiming that the former trustee had instead commingled funds,[59] the actual term itself was and is irrelevant to the matter before me. Robert was and is pursuing records from Bank of America regarding accounts that appear to pertain to a different trust agreement that Mr. Taglialatela, Sr. executed on February 4, 1998, which is irrelevant to this trust accounting. However, to the extent that funds from the Trust were used to communicate with Bank of America in order to protect bank records of another trust account from Robert's discovery, then I uphold

---

[57] *See* Affidavit of Natalie S. Woloshin, Esq. Ex. 6 of Trust Accounting (Detail Fee Transactions 12/20/11, 12/21/11, & 4/5/12).
[58] Trial Transcript on May 22, 2014 at 10-13.

Robert's third exception in part, and recommend that an additional $90.00 of Woloshin's fees[60] be disallowed, and that the former trustee be surcharged this additional amount as well.

I reject Robert's fourth exception because there is no basis in the record to attribute an intent "to delay and drag out the process" to the former trustee after she decided to file and then withdraw her exceptions to my draft report dated February 11, 2013, which recommended her removal as trustee. Had Phyllis that intent, she would have fully litigated her exceptions. Instead, Phyllis merely exercised her right to take exception to a Master's Draft Report, and then later reconsidered and withdrew them.

I reject Robert's fifth exception regarding the apparent cause of this litigation as illogical and irrelevant. In the draft report, I described Robert's trust petition as having apparently spawned the PFA actions in Delaware and Pennsylvania. Now Robert argues that the draft report should have concluded that it was the direct action of the former trustee and Miles and Stockbridge, breaching an agreement they had with Robert to turn over information in anticipation of the sale of the Oxford house, which spawned this litigation. The only evidence of this agreement was an email dated October 25, 2010, from an attorney at Miles and

---

[59] *Id.* at 11-12.

[60] *See* Affidavit of Natalie S. Woloshin, Esq., Ex. 6 of Trust Accounting (Detail Fee Transaction 6/13/2012).

Stockbridge to Robert, agreeing to provide Robert: "(1) a list of expenses chargeable to the Trust that will be paid at settlement from the proceeds of the sale; and (2) the name of the bank where the Trust proceeds will be deposited and held following the sale[,]" in exchange for Robert agreeing not to seek any injunctive or other similar relief that might upset the sale.[61] However, Robert had filed his petition to remove the trustee in this Court on September 22, 2010, a month before this agreement allegedly was reached and nearly two months before the Oxford house was sold. Miles and Stockbridge reviewed Robert's petition as early as September 27, 2010. Once Robert filed his petition to remove her as trustee, Phyllis was placed in a no-win situation. She could choose to fight the petition, and incur additional legal fees and costs for the Trust; she could resign and have a successor trustee take over the administration of the Trust while the sale of the Oxford house was still pending, which would incur additional legal fees and costs, or she could attempt to get the beneficiaries to agree to an immediate distribution of the net sale proceeds and dissolution of the Trust after the Oxford house was sold and the beneficiaries signed appropriate releases, which was not likely given the animosity of some of her siblings. Phyllis chose the last option, to no avail. Blocking the sale of the Oxford house would not have prevented this litigation once it was in progress; such a move would have only made this litigation more

---

[61] Petitioner's List of Exhibits, Ex. B. DI 74.

contentious. Furthermore, the information that Robert had requested from Miles and Stockbridge ultimately was revealed to him in the HUD settlement sheet and bank statements attached to the trust accounting.

In his sixth exception, Robert fails to adequately explain why all of the legal fees and costs of Natalie Woloshin, Esq. from October 20, 2011 onward should be returned to the Trust. Robert seeks to punish the former trustee for relying upon her attorney's advice and assistance in "evading service" while at the same time complaining that if Phyllis had been sincere about defending herself, she should have accepted service and proceeded. After several unsuccessful attempts to resolve the dispute privately, Phyllis did accept service of process and proceeded to defend her administration of the Trust. As discussed above, the former trustee had been attempting to resolve the dispute without having to resort to the litigation. Therefore, I see no reason why, as trustee, her legal fees should be disallowed to the extent that they were incurred in defense of her administration of the Trust. This exception is rejected.

Robert takes exception to the draft report's conclusion that Phyllis had not breached her fiduciary duty prior to Robert's filing of his trust petition in this Court. According to Robert, the former trustee breached her fiduciary duty multiple times from 1998 to 2010 by failing to follow Court of Chancery Rule 132 and, therefore, all commissions she received should be returned to the Trust

because she was incompetent to manage a trust and failed to protect trust property. The record shows that from 1998 until 2010, the Oxford house generated no income and the expenses of maintaining the property were paid out of the personal funds of Mr. Taglialatela, Sr. while his daughter Beatrice was living there. It was not until the Oxford house was sold in November 2010 that there were any trust funds available for a fiduciary commission. In the draft report, I found that the former trustee violated Rule 132 pertaining to fiduciary commissions when she awarded herself a retroactive commission for the services she had rendered to her father and the trust property over the previous 12 years. This breach did not occur until November 2010, after Robert filed his petition.[62] I disallowed $7,443.49 in retroactive commissions, but allowed a total of $1,773.84 in commissions for 2010, 2011, and 2012. I removed the former trustee because the implacable hostility between her and some of the other beneficiaries hindered the proper administration of the Trust, not because she was incompetent per se. After the trust accounting was filed, I found instances of self-dealing and have addressed those occurrences by surcharging the former trustee. Under Rule 132(l), a trustee is entitled to a minimum commission of $400.00 per accounting year. I see no reason to force the former trustee to disgorge her remaining commission. As a result, I am rejecting Robert's seventh exception.

---

[62] Trust Accounting, Ex. 16.

Finally, Robert contends that he is entitled to judgment in the amount of $50,000.00 against Phyllis as compensatory damages. According to Robert, a claim for compensatory and punitive damages was part of his original complaint. According to the record, however, Robert's trust petition sought only the removal of Phyllis as trustee, an accounting of her tenure as trustee, and an injunction to delay the trustee's efforts to "liquidate the assets of the trust" until a successor trustee could be appointed. It was in his answer to the former trustee's counterclaim that Robert first requested monetary damages for the breach of his agreement with the former trustee and Miles and Stockbridge regarding the disclosure of bank information.[63] The counterclaim was later withdrawn by the former trustee; thus, the issue of Robert's compensatory damages is now moot.

## Conclusion

For the reasons stated above, I recommend that the Court surcharge Phyllis an additional $1,200.00 in legal fees and costs paid by the Trust that did not benefit the Trust. This makes a total of $31,987.25 in legal fees, costs, and commissions that were inappropriately paid to law firms or the former trustee in breach of her fiduciary duties. These funds must be returned to the Trust for distribution to the beneficiaries. The remaining exceptions should be dismissed. I am adopting the

---

[63] DI 54.

draft report, as modified above, as my final report. The parties are referred to Rule

144 for the process of taking exception to a Master's Final Report.


Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery


KEA/kekz
cc:    Daniel Crossland, Esquire
       Beatrice Juliano
       Diane Green
       Elizabeth T. Gorman
       Francine Schmitt